IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

| | |
|---|---|
| UNITED STATES OF AMERICA, **Plaintiff,** v. TERESA MILLER, **Defendant**. | Criminal Action No.: 1:19-CR-41 (JUDGE KEELEY) |

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter is before the undersigned pursuant to a Referral Order entered on August 23, 2019 (ECF No. 28) and a Motion to Suppress filed by Defendant, by and through counsel, on August 15, 2019. (ECF No. 22). This matter is now ripe for a report and recommendation to the Honorable Irene M. Keeley. Accordingly, the undersigned **RECOMMENDS** that the Motion (ECF No. 22) be **DENIED** for the foregoing reasons.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### a. July 3rd-4th Traffic Stop

On the evening of July 3, 2018 and into the early hours of July 4, 2018, Officer Helms conducted a traffic stop on a vehicle belonging to Jennifer Phillips. The traffic stop was initiated due to a faulty rear driver side taillight. Upon completion of the stop, Officer Helms conducted a free air dog sniff, using his K-9 partner, Hunter. During this free air dog sniff, Hunter alerted to Officer Helms, who then initiated a full search of Ms. Phillips' vehicle. Also, in the vehicle was Ms. Phillips' boyfriend, Joshua Tusing, and a rear female passenger Teresa Miller. Officers searching the vehicle found two firearms in the vehicle (Cobra Enterprises of UTA, INC., semi-automatic pistol, model Denali, .380 ACP caliber, serial number K22176 and an ARMSCOR

1

semi-automatic pistol ("Citadel"), model 1911-A1 FS, .45 ACP caliber, serial number CIT008030). After discovering these firearms in Ms. Phillips' vehicle, Officer Helms confirmed that Defendant Miller was a prohibited person due to a conviction on November 14, 2013 in the Circuit Court of Monongalia County for Possession with Intent to Deliver a Schedule II Controlled Substance. On July 9, 2019, Defendant Miller was in indicted in this matter for Unlawful Possession of a Firearm for the firearms discovered to be in her possession on July 4, 2018.

### b. Motion to Suppress

On August 15, 2019, Defendant, by and through Counsel, filed a Motion to Suppress (ECF No. 22) arguing that Defendant Miller was detained without reasonable articulable suspicion and beyond the time necessary to issue a citation. ECF No. 22, at 1-2. Defendant argued that Ms. Phillips's traffic stop had been completed for the broken taillight and thus the police officers needed reasonable suspicion to extend the traffic stop. Id. at 6. Defense Counsel argued that the that the police officer's determination that Jennifer Phillips' nervousness which included tapping on the outside of the car door did not support reasonable articulable suspicion. Id.

### c. Government's Response

On August 22, 2019, the Government filed a Response to Defense Counsel's Motion to Suppress. ECF No. 26. The Government argued that Defendant was a passenger in a lawfully stopped vehicle pursuant to a traffic violation and that the traffic stop was extended based on Officer Helms' reasonable articulable suspicion of criminal activity. Id. at 3.

### d. Testimony at the Motion Hearing

Officer David Helms, Morgantown Police Department, testified regarding his traffic stop and subsequent arrest that led to the pending Motion to Suppress:

Office Dave Helms testified that he has worked for the Morgantown Police Department for 14 ½ years (FTR Recording 10:07 AM[1]). He testified that he has been a K-9 officer for the last four years. Id. He has also worked with patrol, street crimes, the Mon-Metro Task Force, as a DEA task force officer, and with the Mountain State Fugitive Task Force. (10:08). As a DEA task force officer, Officer Helms worked exclusively with drug investigations, which included, observing drug activity, using of confidential informants, and developing and investigating cases. Id.

Officer Helms testified that he has had previous training to be able to detect suspicious behaviors and nervous indicators. Officer Helms testified that he has been to multiple drug interdiction schools, statement analysis classes, and interviewing interrogation classes. (10:09-10:10). Officer Helms testified that he was trained in how to look for deceptive behavior, in particular how to conduct a roadside interview. (10:10). This includes indicators of nervousness, drug use, and criminal activity. Id. Officer Helms testified that he conducted 250 to 300 traffic stops in 2018, of which approximately sixty-seven of those were drug traffic stops. (10:11).

Officer Helms testified that Hunter, his K-9 Partner, is a certified North American Working Dog Police Association and was re-certified in March 2018. (10:12). He is certified to detect cocaine, marijuana heroin, and methamphetamine. Id. Officer Helms testified that Hunter is a passive alert dog, which means that he freezes and stares or sits and stares when he is alerting to the odor of a drug. (10:13)

---

[1] This citation will be shortened throughout the Report and Recommendation.

Officer Helms testified that on the night of July 3, 2019, he was parked in his police cruiser in the Smoker Friendly parking lot, in Sabraton, West Virginia. (10:14). Officer Helms testified that this was a central location with a lot of drug activity, and he parks there every shift. Id. Officer Helms testified that there were approximately twenty-three drug arrests in that area in 2018. Id. At approximately midnight, on July 4, 2018, Officer Helms effected the traffic stop of Jennifer Phillips. (10:15) Officer Helms testified that he pulled out of the parking lot, once he saw Phillips drive by with a broken taillight. Id. Officer Helms testified that there was a vehicle in between his and Phillips' vehicle and he waited for that car to move before activating his emergency lights by the Sheetz. (10:16).

Officer Helms estimated that the vehicle did not pull over immediately, but rather fifty and seventy yards past where he intended the car to pull over. (10:17). Officer Helms testified that once he initiated the traffic stop, a second officer advised that he was on his way to Officer Helms' location. (10:18). Officer Helms testified that this was normal for the midnight shift. Id. Officer Helms stated that the fact that the vehicle continued after he activated his lights is a "big red flag." (10:20). Officer Helms stated that when you pass a well-lit area, "you start to think about first officer safety, is there a reason they are pulling you up, especially if they're taking you into a darker area." (10:21). Officer Helms stated that they may be taking time to conceal something if they take their time pulling over or "they are talking amongst themselves, getting a plan together of some sorts." Id. Officer Helms testified that the vehicle eventually stopped. Id.

When Officer Helms approached the vehicle, he noticed three people inside. Id. Officer Helms testified that Jennifer Helms was driving the car and there was a male front passenger and rear female passenger. (10:22). Officer Helms noted that the male passenger was staring straight ahead and was not making eye contact with the Officer. Id. Officer Helms testified that while he

4

was speaking with Ms. Phillips, the female passenger, later identified as Defendant Miller, was staring into her cell phone and making no eye contact with the Officer. Id. Officer Helms stated that normally people will "just sit still or look at you or sometimes even smile." (10:23). Officer Helms noted that Ms. Phillips was fumbling when she is getting her information out and her hands are shaking. Id. Officer Helms stated that she had difficulty finding some of her information. (10:24).

Officer Helms classified this behavior as overly-nervous. Id. Officer Helms testified that he used an interdiction technique to attempt to calm Ms. Phillips down: He told Ms. Phillips that if her license was valid then she would be issued a citation and would be free to leave. (10:25). Officer Helms testified that Ms. Phillips overly shared details of her visit to the DMV with her grandkids. (10:26). Officer Helms testified that he then returned to his vehicle to run her license and to confirm that back up was on their way to his location. Id. Officer Helms testified that he then began filling out the electronic paperwork while waiting on back up to arrive. (10:48). Officer Helms testified that just because he would write a citation did not mean that was the only thing he is going to do on this stop. (10:49).

Officer Helms testified that he was waiting for back up to use Hunter because of all the behavior he witnessed, and he knew back up was already on its way. Id. Officer Helms testified that Officer Molek arrived after a couple of minutes. (10:51). Officer Helms testified that while he was issuing the citation Ms. Phillips was nervously tapping on the outside door of the vehicle and noted that he normally points out these behaviors to other officers when backup officers arrived. (10:52). Officer Phillips then testified that he took Ms. Phillips out of the car and began talking to her. (10:54). Once Officer Helms asked her if there was anything illegal in the car, Ms. Phillips responded to him by stating "not that I know of." Id. Officer Helms testified that this

was an indicator to him because most people can tell you what is in their car. Id. Officer Helms testified that he then took all of the occupants out of the vehicle. Id.

Officer Helms then conducted the dog sniff. Id. Officer Helms testified that Hunter's breathing changes when he has detected an odor and sits to indicate that he has detected an odor. (10:58). Officer Helms stated that after Hunter alerted on the car, he read everyone their Miranda rights and a search was conducted on the vehicle. (10:59). Officer Helms testified that prescription medication, a set of digital scales, backpack with a handgun, and small locked safe with a handgun were found in the car. (11:00). The digital scales, the backpack, and the gun safe were located in the backseat where Defendant Miller was located. Id.

Officer Helms testified that he was familiar with Defendant Miller prior to the traffic stop due to his relationship with drug task force members and knew that she had had prior convictions. (11:01). Officer Helms testified that Joshua Tusing told him he had smoked marijuana earlier in the night, which could have left an odor that led to Hunter alerting on the car. (11:02, 11:08). Officer Helms testified that he asked Defendant Miller and Joshua Tusing separately whether Defendant Miller entered the car with the backpack, which each confirmed she had. (11:03). Officer Helms testified that Ms. Phillips told him that when she was being pulled over, Defendant Miller asked Ms. Phillips to claim ownership of the firearms. Id. Officer Helms testified that the slow roll to stop, bypassing a well-lit area, Phillips' over shaking, nervousness, and tapping on door were all factors that Officer Helm considered. (11:05).

On cross-examination,[2] Officer Helms testified that he pulled out and followed Ms. Phillips for approximately 1/8th of a mile. (11:10). Defense Counsel questioned, while showing police cruiser footage, a car's ability to pull over at the desired location because he turned on his

---

[2] Defense Counsel questioned Officer Helms regarding the training and accuracy of K-9 Hunter. Defense Counsel, however, is not challenging the dog sniff, but rather whether the Officer had reasonable articulable suspicion to extend the traffic stop. Thus, this testimony is not included but is contained in the FTR Recording 11:07-11:08.

6

lights so close to the turn off. Officer Helms responded stated that most people do stop there, some even slam on their breaks and turn in there. (11:12). Officer Helms stated that he considered Ms. Phillips stop to be a "slow-roll stop." (11:14). He stated that the parking lots are well lit. Id.

Officer Helms testified that he could see into the vehicle, better than the video displays, and was using his flashlight to see. (11:16). Officer Helms testified that although the male passenger was initially looking forward, he eventually began helping Ms. Phillips gather her documents. (11:17). Officer Helms testified that Ms. Phillips' hands were shaking, although this is not visible on the camera. (11:18). Officer Helms testified that most people have their documents together, but sometimes takes people time to get their documents together. (11:19). Officer Helms testified that Ms. Phillips inquired what was wrong with the vehicle, which was not uncommon for people to ask about. (11:21). Officer Helms testified that he does not Hunter during a typical traffic stop, but once he began running Ms. Phillips' license, he had decided that he was going to utilize his K-9 Partner. (11:24).

Officer Helms testified that in conjunction with Ms. Phillips nervousness, Joshua Tusing's behavior (avoiding eye contact, looking straight ahead), and Defendant Miller's avoidant behavior were considerations to use his K-9. (11:25). Officer Helms testified that he believed Ms. Phillips' tapping on the outside of her vehicle to be unusual. (11:26). Officer Helms testified that once he pulled Ms. Phillips out of the vehicle and that could have explained her nervousness (11:32). Officer Helms did not know that Defendant Miller was the Teresa Miller that he had heard was distributing controlled substances until Defendant exited the vehicle. (11:33). Officer Helms testified that between telling Hunter to begin to when he alerted was approximately 10 seconds. (11:42). Officer Helms testified that while he does not have the exact

7

number, Hunter has alerted less than ten times where there were no drugs in the vehicle. (11:43). Officer Helms testified that Officer Bradford located the backpack on the floor of the back seat. (11:44). Officer Helms testified that the gun in the unlocked gun case was not loaded. (11:45). The second gun located in the locked safe was not loaded. Id.

Officer Helms testified that the automatic search for active warrants was a delayed notice and he was not notified right away that Ms. Phillips has a warrant. (11:46). Officer Helms testified that he turned off his microphone during the incident to discuss an unrelated issue regarding a previous traffic stop. (11:50).

On re-direct examination, Officer Helms testified that it is both a courtesy and a policy that back up comes to his location. (11:54). Officer Helms testified that he waited until he had backup arrived for officer safety. Id. Officer Helms testified that he works closely with the drug task force and Officer Helms is kept up to date with information with ongoing cases. Id.

## II. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 654 (1979). A law enforcement officer is permitted to stop a vehicle when he or she sees that vehicle violate a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (A traffic stop is reasonable in its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

A traffic stop must also be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." "With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Guijon-Ortiz, 660 F.3d 757 (4th Cir. 2011). During a traffic stop, there is "sufficient justification" to detain a vehicle for as long as needed to perform the "traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriquez v. United States, 135 S. Ct. 1609, 1614 (2015) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

During a traffic stop, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," such as a dog sniff. Rodriguez, 135 S. Ct. at 1615 (citing Arizona v. Johnson, 555 U.S. 323 (2009)). Dog sniffs may be conducted during a lawful traffic stop without implicating the Fourth Amendment as unreasonable. Caballes, 543 U.S. at 405. When conducted during a regular traffic stop for traffic infractions and lacking a close connection to roadway safety, a dog is not considered part of the traffic stop's "mission." Rodriguez, 135 S. Ct. at 1615. Thus, a dog sniff may not prolong a traffic stop absent reasonable articulable suspicion for the dog sniff or the party's consent. United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015).

The analysis to determine whether the scope and duration of the traffic stop was sufficiently limited is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Guijon-Oritz, 660 F.3d at 764. For a traffic stop to be extended beyond what is

required during a routine traffic stop, there must be additional justification other than the original justification for the traffic stop. Id. Furthermore, during a traffic stop, officers may order a driver of the stopped vehicle to exit to car "without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Ohio v. Robinette, 519 U.S. 33 (1996) (citing Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977)).

An officer's authority to detain is terminated when its "no longer necessary to effectuate [the traffic stop's] purpose." Rodriguez, 135 S. Ct. at 1614. The acceptable length of a routine traffic stop cannot be measured with "mathematical precision." United States v. Branch, 537 F.3d at 336. "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, [however] the driver 'must be allowed to proceed on his way.'" Id. "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Branch, 537 F.3d at 336 (citing Florida v. Royer, 460 U.S. 491, 500 (1983)). Thus, "a prolonged automobile stop requires either the driver's consent or a '***reasonable suspicion***' that illegal activity is afoot." Branch, 537 F.3d at 336 (citing United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (emphasis added)).

The reasonable suspicion standard is governed by the United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968) and its progeny. "Terry's 'reasonable suspicion' standard is 'less demanding . . . than probable cause.'" Wardlow, 528 U.S. at 123. In order to justify a Terry stop, "a police officer must simply point to specific and articulable facts, which taken together with rational inferences from those facts," Terry, 392 U.S. at 21, which evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity.'" Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 27)). A police officer must offer 'specific

and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." Branch, 537 F.3d at 337 (quoting Wardlow, 528 U.S. at 123; Terry, 392 U.S. at 21). The "proof necessary to demonstrate 'reasonable suspicion' is 'considerably less than [a] preponderance of the evidence.'" Branch, 537 F.3d at 336. Moreover, "reasonable suspicion' is a 'nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. (citing Ornelas v. United States, 517 U.S. 690, 695 (1996).

### a. The traffic stop was completed prior to the dog sniff.

The purpose of the traffic stop was to issue a citation to Ms. Phillips for a broken rear taillight. Officer Helms did so in a timely manner, completing a license check, local warrant check on the driver, verifying insurance and registration within less than ten minutes. At approximately midnight, however the traffic stop was completed as far as the original purpose of the traffic stop is concerned, *ie*. citing the driver for the broken taillight. Thus, in order to extend the traffic stop beyond this point, Officer Helms would need to have had reasonable articulable suspicion that criminal activity was afoot.

### b. Officer Helms had reasonable articulable suspicion to prolong the traffic stop.

Defense Counsel argued that Officer Helms did not possess reasonable articulable suspicion, but rather extended the traffic stop based on Ms. Phillips' nervousness alone. After careful consideration of the parties' arguments, the testimony presented, and the video footage, the undersigned finds that Officer Helms did have reasonable articulable suspicion to prolong the traffic stop to conduct a free air dog sniff. The undersigned first considers the totality of the factors that were known to Officer Helms during the traffic stop and that he testified were a part of his consideration: Ms. Phillips' continuous and noticeable shaking, Ms. Phillips' excessive

chattiness, Joshua Tusing's lack of eye contact, Defendant Miller's lack of eye contact, Defendant Miller's concentration on her phone, Ms. Phillips' slow roll to the traffic stop in a dark area, and the area in which the traffic stop occurred.

First, the undersigned considered both the video evidence and Officer Helms' testimony regarding Ms. Phillips' nervousness. This was a big consideration in Officer Helms' testimony. While the undersigned does not consider the only factor to be nervousness, the extent of Ms. Phillips' nervousness is a factor for consideration. United States v. Bowman, 884 F.3d 200 (4th Cir. 2018) (a driver's nervousness is not a particularly good indicator of criminal activity, evasive behavior is relevant to the determination). Officer Helms testified that she was visibly shaking, she was excessively talking and telling him unnecessary details about her day and continued to be excessively nervous even after he told her that if she had a valid license that he would cite her and let her leave. Officer Helms also noted that he could see Ms. Phillips tapping nervously on the outside of her vehicle while she was waiting for him to issue the citation. Even when Ms. Phillips was pulled from the car, Officer Helms noted that she did not know whether there was anything illegal in her car and could only state that she nor her boyfriend had nothing illegal in the vehicle.[3]

Second, the undersigned considered the evasive and avoidant behavior exhibited by both the passengers. Officer Helms made note of these passengers and noted that neither of these passengers were looking at him or looking around. Officer Helms stated that Joshua Tusing stared straight ahead when he approached Ms. Phillips' vehicle. Although, the undersigned did

---

[3] The undersigned finds that Ms. Phillips' behavior up until she exited the vehicle is indicative of someone who is uncommonly nervous for a normal traffic stop. The undersigned finds that her nervousness excessive only after she exited the vehicle. However, the undersigned only reviews the factors considered up until the use of Officer Helms' K-9 Partner, Hunter, because the Officer needed reasonable articulable suspicion at that point to extend the traffic stop. Once Hunter alerted on the car, there was probable cause to search the vehicle and extend the traffic stop further. Neither party disputes this argument.

consider that he began helping Ms. Phillips to locate her documents and did communicate directly with the police officer, eventually. Defendant Miller, however, avoided eye contact with Officer Helms and stared at her phone.

Third, the undersigned considered the slow roll stop that Officer Helms described. Officer Helms testified that he often initiates traffic stops at a particular location because there is a turn off into a well-lit area that allows drivers to pull over in a safe area. Officer Helms testified that he pulled Ms. Phillips over and she drove past this location that he intended for her to stop her vehicle. While Defense Counsel brought out on cross-examination that Ms. Phillips pulled over less than two minutes after Officer Helms utilized his lights, Officer Helms categorized her stop as a "slow roll."

The undersigned also finds Officer Helms' testimony to be credible. Moreover, the Officers fourteen and a half years working for the Morgantown Police Department and four years as a K-9 Officer, including his vast drug interdiction experience, weighs heavily in this consideration. Branch, 537 F.3d at 337 ("respect for the training and expertise of police officers matters as well . . . 'the practical experience of officers who observe on a daily basis what transpires on the street'"). Officer Helms has been trained in drug investigations and has worked for more than a decade investigating drug cases. Furthermore, Officer Helms' extensive training in detection of nervous behavior is pertinent to the analysis.

Defense Counsel did discount each individual factor considered by Officer Helms and he testified that there could be some other explanations for why those factors may occur. However, the undersigned is reviewing the "'cumulative information available' to the officer." Branch, 537 F.3d at 337. The undersigned is not giving grave consideration to the "piecemeal refutation of each individual' fact and inference" as Defendant attempted to do by refuting the reasons for the

extension. See id. (citing United States v. Whitehead, 849 F.2d 849 (4th Cir. 1988)). Each of the individual factors presented by Officer Helms could alone constitute innocent travel, however, together and in consideration of his experience as a drug investigator and police officer, produce reasonable suspicion. See Branch, 537 F.3d at 337. Furthermore, when taken together, the factors considered are not probative of behavior in which few innocent people would engage. United States v. Sokolow, 490 U.S. 1 (1989). Accordingly, the undersigned finds that Officer Helms had reasonable articulable suspicion that criminal activity was afoot and had justification to extend the traffic stop to conduct a free air dog sniff.

## III.     RECOMMENDATION

For the above stated reasons, the undersigned **RECOMMENDS** that the Motion to Suppress be **DENIED**. (ECF No. 22).

Any party shall have until Friday September 6, 2019, at 11:59PM[4] from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

---

[4] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, n. 1 (N.D. W. Va., Oct. 6, 2011); United States v. Mason, 2011 WL 128566, n. 7 (N.D.W. Va. Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Irene Keeley on September 9, 2019 and Jury Selection and Trial is set for September 30, 2019. The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation and will be due by September 6, 2019.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a Copy of this Report and Recommendation of counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Date: September 4, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE