**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-4086

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

TERESA MILLER,

        Defendant – Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. Irene M. Keeley, Senior District Judge. (1:19-cr-00041-IMK-MJA-1)

Argued: October 28, 2022          Decided: November 29, 2022

Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges.

Affirmed in part, reversed in part, conviction and sentence vacated, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Agee and Judge Diaz joined.

**ARGUED:** Jenny R. Thoma, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant. Zelda Elizabeth Wesley, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee. **ON BRIEF:** Hilary L. Godwin, Assistant Federal Public Defender, Katy J. Cimino, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant. Randolph J. Bernard, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

GREGORY, Chief Judge:

Teresa Miller was indicted on one count of unlawfully possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The firearms at issue were uncovered during a traffic stop. Miller was traveling in the backseat of a vehicle operated by Jessica Phillips when the vehicle was stopped by Officer Helms for having an inoperable taillight. After printing a warning citation for Phillips, Officer Helms used his canine to sniff around the vehicle, and then conducted a full search when the dog alerted, uncovering two firearms in Miller's backpack. The district court denied Miller's motion to suppress evidence of the firearms, concluding that Officer Helms had reasonable suspicion to extend the stop and conduct the search. Following a bench trial, Miller was convicted of one count of unlawfully possessing a firearm.

On appeal, Miller argues that the district court erred by (1) denying her motion to transfer the proceedings to another district pursuant to Federal Rule of Criminal Procedure 21(a) and (2) finding that Officer Helms had reasonable suspicion to extend the traffic stop.

We hold that (1) Miller's motion to transfer was appropriately denied and (2) Officer Helms lacked a reasonable, articulable factual basis for extending the traffic stop to conduct the dog sniff.[1] We therefore reverse the district court's order denying Miller's motion to suppress, vacate Miller's conviction and sentence, and remand to the district court for proceedings consistent with this opinion.

---

[1] There is no dispute that once the dog alerted on the vehicle, Officer Helms had probable cause to conduct a full search.

I.

On July 3, 2018, Officer Helms, who conducts surveillance with a canine, stopped a vehicle driven by Phillips for having an inoperable taillight. *See* Supplemental J.A. Volume I ("S.J.A. I"); *see also* J.A. 109.[2] Officer Helms's dashboard camera captured footage of the traffic stop. The footage begins roughly thirty-one seconds before Officer Helms turned on his lights to pull Phillips over. Supplemental J.A. Volume II ("S.J.A. II") at 00:00-00:31.[3] When Officer Helms turned on his lights, Phillips's vehicle was essentially parallel with a turn lane that led to a well-lit parking lot. *Id*. at 00:31. Phillips hit her brakes just four seconds after Officer Helms's lights came on and activated her blinker three seconds after hitting her brakes. *Id*. at 00:35-00:38. Phillips came to a complete stop seventeen seconds after Officer Helms turned his lights on. *Id*. at 00:48.

After Phillips came to a stop, Officer Helms approached the driver's side of the vehicle. His body camera captured his exchange with Phillips. Shortly after Officer Helms approached Phillips's vehicle, she began searching for her license. S.J.A. I 00:00-00:30. While Officer Helms testified that Phillips's hands were shaking during the encounter, her hands did not appear to be shaking while she was handing Officer Helms her license or her

---

[2] While Officer Helms stated that the stop occurred on July 4, the stop was instituted approximately ten minutes before midnight on July 3, as shown by the body camera footage. The search, however, began on July 4. *See* S.J.A. I at 08:00.

[3] Two days before oral argument, Miller submitted a motion to file a supplemental appendix containing the dashboard camera footage. The footage is considered a part of the record on appeal because it was a part of the record at the district court. *See* Fed. R. App. P. 30(a)(1). Although the footage need not be included as an appendix, the motion is granted. *See* Fed. R. App. P. 30(a)(2).

insurance information. *See id*. at 00:28-00:32, 00:35-00:40; J.A. 117.[4] The next time that Phillips's hands were in view, it still was not evident that she was shaking. *Id*. at 01:11-01:18, 01:25-01:32.

While Phillips was looking for the vehicle's registration card, she noted that the vehicle was not very organized and, as a result, she was struggling to locate the card. *Id*. at 00:45-01:35. Phillips stated that she had seen the registration card earlier that day because she used it at the Department of Motor Vehicles ("DMV"). *Id*. at 00:58-01:01. Officer Helms then asked Phillips if "everything [was] good with her license," to which she replied "yeah," and then noted that she had renewed her license at the DMV earlier that day and had to wait three hours to do so. *Id*. at 01:01-01:09. Officer Helms responded, "ah, that's always awesome." *Id*. at 01:08-01:11. While continuing to search for the registration card, Phillips continued the conversation, saying that "it took [her] three hours and twenty minutes to renew [her] license." *Id*. at 01:14-01:20. Officer Helms responded by laughing and saying, "that's always pleasant." *Id*. Expanding on her unpleasant DMV experience, Phillips stated that she had to supervise her three grandchildren while at the DMV. *Id*. at 01:21-01:25. Officer Helms then said, "if everything is good, I'm just going to cut you a warning." *Id*. at 01:34-01:37. Phillips thanked him. *Id*. at 01:38-01:40. Officer Helms returned to his car just one minute and fifty seconds after he initially approached Phillips's vehicle. *Id*. at 01:50.

---

[4] Officer Helms held the insurance paper in front of his body camera for a prolonged period of time, obstructing the body camera's view of Phillips. S.J.A. I at 00:45-01:23.

4

When a backup officer arrived,[5] Officer Helms told him that he was suspicious of the vehicle's occupants because Phillips was shaking and tapping on the car door. *Id*. at 07:15-07:50. At approximately the same time, Officer Helms printed Phillips's warning ticket. *Id*. at 07:15. Soon thereafter, Officer Helms approached Phillips's vehicle, asked Phillips to exit the vehicle, and told her he would be leading his canine around the vehicle to sniff for illegal drugs. *Id*. at 08:25. After the canine indicated that there were drugs in the vehicle, officers performed a full search. *Id*. at 12:00-12:15. During the search, they located two handguns in Miller's backpack. J.A. 127.

In July 2019, Miller was indicted in the Northern District of West Virginia for unlawfully possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). J.A. 15–16. Acting *pro se*, Miller filed a motion to transfer her case to another district because multiple civil suits she had previously filed in the Northern District of West Virginia—which named judges sitting in that district as defendants—had been transferred to the Southern District of West Virginia due to a conflict of interest. J.A. 17–19; *see Miller v. Gaujot*, No. 2:16-CV-50 (N.D.W. Va. Oct. 6, 2017); *Miller v. Gaujot*, No. 1:17-CV-128 (N.D.W. Va. Sep. 5, 2017). The district court denied the motion because defense counsel, who was appointed just two days after Miller filed the motion, refused to adopt it. J.A. 24–27.[6]

---

[5] Officer Helms testified that it is standard procedure for officers to provide backup during night shift traffic stops. J.A. 170.

[6] The district court addressed the issue again at sentencing and stated that the civil cases had to be transferred because they created a conflict of interest between the judges sitting in that district. J.A. 302.

5

Miller later filed a motion to suppress evidence of the firearms, arguing that the extension of the stop to conduct the dog sniff violated the Fourth Amendment. J.A. 33–34. A magistrate judge recommended denying the motion. The district court adopted the majority of the magistrate judge's report and recommendation,[7] including its ultimate recommendation to deny Miller's motion to suppress. J.A. 72–73. The district court held that the magistrate judge properly (1) considered Officer Helms's experience and training; (2) determined that Phillips was excessively nervous; and (3) concluded that Phillips was slow to pull over. J.A. 83–91.[8]

Regarding Phillips's alleged nervousness, the district court stated that while the body camera footage was not clear enough to see whether Phillips was shaking, she exhibited nervous behavior by sharing unnecessary details of her day, her nervousness did not subside after she was told she would receive a warning if her license was clean, and tapping her fingers on the car door constituted excessively nervous behavior. J.A. 86–88. Further, the district court noted that Phillips "was slow to pull over and passed at least one or two well-lit streets and parking lots in favor of a dimly-lit section of Route 7." J.A. 88–90. In considering whether Phillips was slow to stop, the district court found it significant that Phillips would have travelled roughly 100 yards if traveling at 35 miles per hour for

---

[7] The district court rejected only one portion of the magistrate judge's report and recommendation, which considered the passengers' lack of eye contact when analyzing whether Officer Helms had reasonable suspicion to extend the stop. J.A. 91.

[8] The district court only considered evidence arising before Officer Helms printed the warning ticket, which occurred approximately seven-and-a-half minutes after the initial stop. J.A. 82; S.J.A. I at 07:10.

six seconds. J.A. 90.[9] Finally, the district court noted that Route 7 was a known drug corridor. J.A. 91. These factors, it concluded, were enough to establish reasonable suspicion for Officer Helms to extend the traffic stop. J.A. 92.

## II.

We first address Miller's argument that the district court erred by refusing to transfer her case to another district. We conclude that the district court did not so err.

### A.

We consider Miller's appeal from the district court's order denying her motion to transfer pursuant to Federal Rule of Criminal Procedure 21(a). Notably, the Government interprets Miller's motion to be for recusal rather than transfer. But regardless of whether Miller moved for transfer or recusal, we review for abuse of discretion. *See Scott v. United States*, 255 F.2d 18, 20 (4th Cir. 1958); *United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008).

### B.

Miller filed a *pro se* motion to transfer under Rule 21(a), which states that "the court must transfer the proceeding against [the] defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). Miller filed the motion just two days before being appointed counsel, and counsel subsequently refused to adopt the motion. J.A. 17–19, 46–26. The district court declined to consider the

---

[9] The district court did not further explain why the distance that Phillips travelled was more important than the time it took for her to come to a complete stop.

motion, reasoning that every circuit court to address the issue has held that a district court has no obligation to consider a *pro se* motion filed by a represented party. J.A. 24–25.

Miller argues that this case should have been transferred to the Southern District of West Virginia because the civil cases she had filed in the Northern District had been transferred due to a conflict of interest. Tellingly, Miller's appellate counsel does not appear to support this argument. Brief of Appellant at 12 (stating that "Counsel's research into this issue does not appear to offer relief; however, as the issue was preserved below, Miller respectfully requests this Court consider Miller's argument and whether it has merit.").

The Government characterizes Miller's motion as a motion for recusal rather than transfer and argues that, because the civil cases are unrelated to this criminal action, they do not bring the district court's impartiality into question.

Under either standard, the district court did not have to transfer this case because Rule 21(a) addresses juror, rather than judicial, prejudice, and the district judge was not otherwise required to recuse herself.

It is quite clear that district courts are "not require[d] . . . to permit 'hybrid' representation," which occurs when a person is represented by counsel but still seeks to act as her own attorney, during a court hearing or jury trial. *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). This Court has echoed this view, albeit in an unpublished opinion, with regard to written motions. *See United States v. Barnes*, 358 F. App'x 412, 413 (4th Cir.

8

2009).[10] As the district court correctly noted, other circuits agree that a defendant has no right to hybrid representation for written motions. *See, e.g.*, *Clark v. Perez*, 510 F.3d 382, 395 (2d Cir. 2008); *Myers v. Johnson*, 76 F.3d 1330, 1335 (5th Cir. 1996); *United States v. Hill*, 526 F.2d 1019, 1024 (10th Cir. 1975).

The question here is whether the district court must consider a *pro se* motion filed before the defendant is appointed counsel and counsel refuses to adopt the motion once appointed. No circuit seems to have passed judgment on this precise issue. We need not resolve that question here, because Miller's motion fails on the merits.

Rule 21(a) is commonly invoked when pre-trial publicity could taint the jury pool, which indicates that the rule is designed to prevent juror, rather than judicial, prejudice. *See, e.g.*, *United States v. Higgs*, 353 F.3d 281, 307–08 (4th Cir. 2003); *United States v. Langford*, 647 F.3d 1309, 1332 (11th Cir. 2011); *United States v. Skelos*, 988 F.3d 645, 659 (2d Cir. 2021). Note 4 of the 1944 Advisory Committee Notes on Rule 21(a) states that the Rule applies "in addition to and does not supersede existing statutes enabling a party to secure a change of judge on the ground of personal bias or prejudice." Additionally, Note 1 of the 1944 Advisory Committee Notes states that Rules 21(a) and (b) provide a new right for defendants to move for a change of venue based on the "public feeling in the vicinity of the crime [that] may render impossible a fair and impartial trial." Therefore, Rule 21(a) appears to be concerned with juror, rather than judicial, prejudice.

---

[10] Similarly, a litigant may not "raise substantive motions while [she] is represented by counsel" in this Court. *United States v. Washington*, 743 F.3d 938, 941 n.1 (4th Cir. 2014) (internal quotations omitted).

Thus, Miller's motion for transfer should have been brought as a motion for recusal and was properly denied.

Even if Miller's motion is treated as a motion for recusal, as the Government seems to believe, it would still fail. Miller overstates the possibility that her prior civil suits would threaten the impartiality of judicial proceedings. As the district court explained, the civil cases had to be transferred out of the Northern District of West Virginia because they named judges sitting in that district as defendants, thereby creating a conflict. J.A. 302.

There is no such conflict in Miller's criminal case. The judge in her criminal case was not named as a defendant in the civil cases, so any relation between the civil and criminal cases is too attenuated to warrant recusal. Miller has made no showing that the district judge has personal bias against her, and she cannot point to any evidence of partiality. *See* 28 U.S.C. § 455(a) (stating that a judge should recuse herself if her "impartiality might reasonably be questioned"); 28 U.S.C. § 455(b)(1) (stating that a judge should recuse herself where she "has a personal bias or prejudice concerning a party"). Accordingly, the district court properly denied Miller's motion for transfer.

III.

A.

"In considering the district court's suppression decision, we review legal determinations de novo and the [district] court's underlying factual findings for clear error." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018). We construe the facts in the Government's favor. *United States v. Brinkley*, 980 F3d 377, 383 (4th Cir. 2020).

10

The standard governing traffic stops under the Fourth Amendment is well-established in this Circuit. Traffic stops are "subject to the reasonableness requirement of the Fourth Amendment." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). The standard the Supreme Court articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), applies to traffic stops because they are investigatory stops rather than custodial arrests. *Bowman*, 884 F.3d at 209. Accordingly, we ask "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." *Id.* (cleaned up). For the initial stop to be reasonable, the officer must have probable cause to believe a traffic violation occurred. *Id*. However, a traffic stop that was reasonable at its inception can violate the Fourth Amendment when an officer extends the stop beyond the "'time reasonably required to complete [the] mission' of issuing a warning ticket." *Id*. at 209–10 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (brackets in original)). Even a de minimis extension violates the Fourth Amendment. *Id*. at 210. In order to extend a traffic stop beyond what is necessary to effectuate its original purpose, the officer must possess reasonable suspicion. *Id*.

"A dog sniff around [a] vehicle's perimeter for the purpose of detecting narcotics 'is not an ordinary incident of a traffic stop.'" *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)). However, the officer may "conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" *Id*. (quoting *Rodriguez*, 575 U.S. at 354) (brackets and emphasis in original). Thus, a canine sniff that is unrelated to the purpose of the original stop is lawful only if it does not extend the traffic stop or is based on reasonable suspicion. *See id.* at 209.

11

Reasonable suspicion "require[s] something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *Terry*, 392 U.S. at 27). Indeed, "an officer and the Government must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). That said, the reasonable suspicion standard is not mechanical; rather, it "entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

To support reasonable suspicion, an officer must put forth "specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *Bowman*, 884 F.3d at 213 (internal quotations omitted). The Government may not rely on post hoc rationalizations to explain a search—rather, the officer must have had a reasonable suspicion at the time the search was conducted. *See United States v. Digiovanni*, 650 F.3d 498, 511–12 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez*, 575 U.S. 348. Accordingly, we consider only those facts known to the officer at the time of the search. *See id*.

When assessing whether reasonable suspicion existed, we view the evidence in its totality, while remaining "mindful of the practical experience of officers who observe on a daily basis what transpires on the street." *Bowman*, 884 F.3d at 214 (internal quotations omitted). However, we address each factor individually before evaluating them together. *Id*. Critically, the facts "must in their totality serve to eliminate a substantial portion of innocent travelers." *Id*. at 213 (internal quotations omitted).

One relevant factor in the reasonable suspicion inquiry is whether a driver was excessively nervous during the stop. *Id*. at 214. In analyzing this factor, we have considered, *inter alia*, whether the driver was fidgeting, shaking, or talking nervously. *See id.*; *United States v. Vaughan*, 700 F.3d 705, 711 (4th Cir. 2012). But "[a]s this court has recognized on multiple occasions, a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *Bowman*, 884 F.3d at 214 (internal quotations omitted). The suspect's nervousness must therefore be unusual, beyond the norm, or evasive. *Id.*; *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011). Therefore, "absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *Bowman*, 884 F.3d at 214 (quoting *Massenburg*, 654 F.3d at 490). In determining whether a person was excessively nervous, it is relevant whether their nervousness subsided or increased after the initial stop because an innocent person's nerves tend to decrease as the traffic stop progresses. *See Bowman*, 884 F.3d at 214–15; *Vaughan*, 700 F.3d at 711.

Other relevant factors include the road the driver was traveling on and the length of time it took the driver to pull over. *See United States v. Mason*, 628 F.3d 123, 128–29 (4th Cir. 2010); *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015). But the mere fact that a person is traveling on a route commonly used to transport drugs, "standing alone, is entitled to very little weight." *Williams*, 808 F.3d at 247. We have observed that "the number of persons using interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads," which makes it doubtful that the mere fact a

13

person was traveling on such a road late at night "helps narrow the identification of travelers to those involved in drug activity." *Williams*, 808 F.3d at 247; *see also United States v. Villavicencio*, 825 F. App'x 88, 98 (4th Cir. 2020).

Finally, when an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements. *See Digiovanni*, 650 F.3d at 512–13.

B.

To reiterate, the district court held that Officer Helms had reasonable suspicion to extend the traffic stop because Phillips was (1) slow to pull over, (2) excessively nervous, and (3) traveling on a known drug corridor. The district court gave great weight to Officer Helms's experience in its analysis.[11] It determined that Phillips was slow to pull over because she "passed at least one or two well-lit streets and parking lots in favor of a dimly-lit section of Route 7." J.A. 89–90. It further found that Phillips was excessively nervous because she was allegedly shaking during the traffic stop, talking excessively, and tapping her fingers on the outside of her car door. The district court also found that Phillips's nervousness did not decrease after being told she would only receive a warning. Finally,

---

[11] Officer Helms testified to having over fourteen years of law enforcement experience with the Morgantown Police Department—including assignments to the Department's Street Crimes Unit and the Department's Drug Task Force. J.A. 103–04. Officer Helms noted that he had received training for drug interdiction that included courses on how to spot deceptive behavior. J.A. 105. He also testified to having executed more than 2,000 traffic stops throughout his career, with approximately 300 of those occurring in 2018. J.A. 85, 106–07. Of those 300 stops in 2018, he said, more than 60 resulted in drug prosecutions. J.A. 106–07.

USCA4 Appeal: 21-4086      Doc: 83         Filed: 11/29/2022    Pg: 15 of 20

the district court credited Officer Helms's testimony that Route 7 was "a corridor commonly used to traffic drugs between counties." J.A. 91, 108.

Here, however, the video evidence does not support some of Officer Helms's statements and impressions. As we explain, the district court clearly erred by crediting portions of Officer Helms's testimony regarding whether Phillips was slow to stop and excessively nervous. These erroneous findings of fact ultimately led the district court to incorrectly find that Officer Helms possessed reasonable suspicion to extend the traffic stop.

1.

First, Phillips was not unduly slow to pull over. Phillips was even with the turn lane when Officer Helms's lights first came on. She hit her brakes four seconds after his lights came on, activated her blinker three seconds after that, and stopped the vehicle a total of seventeen seconds after Officer Helms first activated his lights. S.J.A. II at 00:31-00:48. The district court nonetheless found that Phillips was slow to pull over and passed "at least one or two well-lit streets and parking lots in favor of a dimly-lit section of Route 7." J.A. 89–90. It also noted that the seventeen seconds it took Phillips to stop gave her an opportunity to converse with her passengers about how to cover up criminal conduct. J.A. 89. Additionally, the district court found the distance the vehicle traveled in those seventeen seconds (100 yards) was more important than the time it took for her to stop. J.A. 90.

We cannot agree. Just as officers are not required to complete a traffic stop as quickly as humanly possible, drivers should not be required to pull over as quickly as humanly possible—especially when a driver may need to continue driving for a slightly longer amount of time to reach a safer stopping point—as long as the time it took to stop

was reasonable. *See United States v. Perez*, 30 F.4th 369, 375–76 (4th Cir. 2022) (finding that an officer's search of a vehicle was proper despite it not being completed as quickly as possible due to the officer's reasonable safety precautions). Such a rule deters the Government from transforming innocuous behavior—or, as found here, behavior that enhances the safety of the driver, the officer, and others on the road—into evidence of criminality. *See Foster*, 634 F.3d at 248 (expressing "concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity").

Our analysis is necessarily fact-specific, and the ultimate touchstone is whether the driver pulled over in a reasonable amount of time given the circumstances. Still, some commonsense principles should guide the way. First, a driver should be given time to react and be entitled to make certain that a hailing officer intends to pull them over rather than simply pass them on the way to another emergency. Second, a driver should be given a meaningful opportunity to reach a safe place to stop.

Here, the video evidence from Officer Helms's dashboard camera shows that Phillips stopped within a reasonable amount of time. Phillips could not have pulled into the well-lit parking lot that Officer Helms intended her to because she was parallel with the entrance when Officer Helms activated his lights. And contrary to the district court's findings, the video shows Phillips did not pass any other area, well-lit or otherwise, where she could have safely stopped. There were no earlier exits, and the road did not have a shoulder. Next, Phillips began braking just four seconds after Officer Helms turned his lights on, indicating that she was in the process of stopping. Four seconds is a reasonable

16

time for a person to react and determine that an officer intends to pull her over. While it ultimately took Phillips thirteen seconds to come to a complete stop after first engaging her brakes, she stopped at the first available place on the road where she could safely do so. Under these facts, she came to a stop in a reasonable amount of time.

The fact that Officer Helms intended for Phillips to turn into the well-lit parking lot is of little probative value because Phillips had no way of knowing Helms's intention. Although Officer Helms had extensive experience conducting traffic stops, Phillips did not. Thus, she should not be expected to intuit the precise place Officer Helms wanted her to pull over.

Accordingly, the district court clearly erred by finding that Phillips was slow to pull over.

2.

Second, the body camera footage showed that Phillips was not excessively nervous during the traffic stop. On that point, the footage of the stop depicts multiple instances where Phillips's hands can be seen. *See* S.J.A. I at 00:28-00:32, 00:35-00:40, 01:11-01:18, 01:25-01:32. While the district court is correct that the video does not show Phillips's hands the entire time, the video clarity is quite good, and shows that her hands were not shaking. *See id*. Moreover, her hands can be seen both at the beginning of the encounter and at the end, and the video footage shows that her demeanor did not change throughout the conversation. Thus, the district court clearly erred by finding that Phillips was shaking during the traffic stop.

The body camera footage also refutes Officer Helms's testimony that Phillips was nervously talking and sharing unnecessary details about her day. The footage shows that Phillips was simply making related small talk and responding to the questions Officer Helms

17

Case 1:19-cr-00041-TSK-MJA   Document 182   Filed 11/29/22   Page 18 of 20  PageID #: 944
USCA4 Appeal: 21-4086      Doc: 83            Filed: 11/29/2022      Pg: 18 of 20 


asked. For instance, while looking for the vehicle's registration card, Phillips noted that the car was not very organized, which was why she was struggling to find the card. *Id*. at 00:45-01:00. Phillips also stated that she had seen the registration card earlier in the day because she had used it at the DMV. That point was directly relevant to the stop, given that Officer Helms asked to see the card. *Id*. at 00:50-01:00. In context, it is clear that she was simply explaining that she knew the card was somewhere in the car.

Phillips's allegedly unrelated statement about her visit to the DMV was made in response to Officer Helms asking her if "everything [was] good with [her] license." *Id*. at 01:00-01:05; *see* J.A. 86. She responded by saying that she knew her license was "good" because she had visited the DMV to renew it earlier that day. S.J.A. I at 01:05-01:30. The allegedly "unnecessary details of her day" that Phillips shared were simply remarks about how unpleasant her DMV experience was. *Id*.; *see* J.A. 87. In response to her comments about the long wait time at the DMV and having to simultaneously watch her three grandchildren, Officer Helms even chuckled and remarked, "that's always pleasant." S.J.A. I at 01:15-01:20. It is hard to imagine why this exchange would arouse suspicions of criminal behavior. The district court clearly erred by finding that Phillips was talking excessively and that these statements were unrelated to the traffic stop.

Additionally, the district court found it "significant" that Phillips remained nervous "despite having been told by Officer Helms that she would be free to go if her license came back clean." J.A. 87–88. The only (arguably) nervous behavior the Government can point to after Officer Helms's statement is Phillips tapping her fingers on the car door. But tapping is not an indicator of excessive or sustained nervousness because it is completely

18

consistent with law abiding behavior. Although fidgeting may certainly be a sign of nervousness, *Bowman*, 884 F.3d at 214, tapping one's fingers may just as likely be a sign of annoyance, impatience, or even boredom—any of which may be expected when a person is stopped by a police officer and is awaiting the results of a license check. By itself, tapping one's fingers is a very weak indicator of nervousness.

3.

Finally, the district court thought it relevant to the reasonable suspicion analysis that Phillips was traveling on a known drug corridor.

But this Court has stated that traveling on a known drug corridor is not itself probative of criminal behavior and does not serve to eliminate a substantial portion of innocent travelers. *See Williams*, 808 F.3d at 247 (explaining that "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads" and stating that "we are not persuaded by the proposition that traveling south on [a known drug corridor] late at night helps narrow the identification of travelers to those involved in drug activity.").

Considering the record as a whole, and even after accounting for Officer Helms's substantial experience, we conclude that Officer Helms did not have reasonable suspicion to extend the stop. Simply put, the factors articulated to support reasonable suspicion in

this case do not "serve to eliminate a substantial portion of innocent travelers." *Foreman*, 369 F.3d at 781. The district court erred in denying the motion to suppress.[12]

IV.

In sum, we affirm the district court's denial of Miller's motion to transfer. But because the extension of the traffic stop was not supported by reasonable suspicion, the district court erred in denying Miller's motion to suppress the evidence seized during the subsequent search. Accordingly, the district court's order denying Miller's motion to suppress is reversed, Miller's conviction and sentence are vacated, and the case is remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART,*
*CONVICTION AND SENTENCE VACATED, AND REMANDED*

---

[12] Miller also challenges the district court's sentencing decision, arguing that it focused too heavily on a single issue at the expense of a properly reasoned analysis of the 18 U.S.C. § 3553(a) factors. Because we vacate Miller's conviction and sentence based on the Fourth Amendment violation, this issue is now moot.